UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CATHERINE J. FOURNEY,

       Plaintiff,

v.                             Civil Action No. 2:09-0176

LIFE INSURANCE COMPANY
OF NORTH AMERICA,

       Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

       Pending are cross motions for summary judgment filed by plaintiff Catherine J. Fourney and defendant Life Insurance Company of North America ("LINA"), each filed on May 17, 2010.

I.

       Fourney is a West Virginia resident formerly employed as a clinical nurse by Camcare, Inc. ("Camcare"), at Charleston Area Medical Center.  (Compl. ¶ 2).  Camcare holds a group disability insurance policy issued by LINA.  The LINA policy includes a long-term disability plan ("Plan").  Fourney was a participant in the Plan, which the parties agree qualifies as an employee benefit plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 <u>et</u> <u>seq.</u>  In the factual discussion that follows, the court will examine (1) Fourney's medical history as it appears in the administrative

record; (2) the relevant Plan provisions; and (3) the procedural history of Fourney's claim and this action.

A.    Fourney's Medical History within the Administrative Record

Fourney is now 45 years of age.  In 1984, she was diagnosed with Type 1 diabetes.  (Admin. Rec. at 407) (hereinafter "AR at ").  Beginning in 1998, Fourney developed end-stage renal disease, a complication of the kidneys requiring her to undergo dialysis up to three times per week.  (AR at 723, 1434).  Fourney's condition left her constantly fatigued and caused severe gastrointestinal problems, including nausea and vomiting.  (AR at 1434).  She ceased working for Camcare on September 5, 2000, due to her kidney disease and was hospitalized on various occasions in September and October 2000.  (AR at 141, 723).

On October 14, 2000, Fourney submitted a claim to LINA for disability benefits under the Plan.  (AR at 1435).  In the disability claim, Fourney's physician noted that Fourney had complained of a number of subjective symptoms, including "fluid overload, nausea, vomiting, [and] fatigue."  (AR at 1434).  Her physician further rated Fourney's "maximum level of ability" as "sedentary," meaning she could walk occasionally and lift up to

2

ten pounds.  (AR at 1435).  In a disability questionnaire submitted in support of her claim for disability, Fourney explained how her medical condition impacted her daily life.  (AR at 1428-30).  Notably, Fourney asserted that, despite her illness, she remained active by going for regular walks.  (AR at 1429).  In January 2001, LINA determined that Fourney was totally disabled as defined by the Plan, recognizing that her regular occupation as a nurse required her to stand, walk, lift, and engage in other physical activities well beyond her limitations. (AR at 1406, 1439-40).

        In 2001, Fourney underwent two renal transplants, and her condition thereafter improved.  (AR at 724).  In June 2002, her endocrinologist, Dr. Greta Guyer, reported to LINA that Fourney suffered from Type 1 diabetes with nephropathy and retinopathy and complained of anemia, weakness, and fatigue.  (AR at 1173).  Nevertheless, Dr. Guyer asserted that Fourney was capable of performing sedentary work.  (Id.).  Likewise, Dr. Charles Cangro, Fourney's nephrologist, asserted that Fourney would benefit from re-entering the workforce.  (Id.).  Consistent with her doctors' reports, Fourney completed a disability questionnaire in June 2002 regarding her daily activities, again indicating that she remained active.  (AR at 1302).

Specifically, Fourney asserted that she went for walks three to four times per week; exercised at a local gym three times per week; and was capable of driving up to 100 miles at a time. (AR at 1302-03).

Upon receipt of Fourney's June 2002 disability questionnaire and her doctors' recommendations, LINA identified a number of transferable occupations within her physical capabilities and thus concluded that she was no longer disabled from performing the duties of any occupation, as required for the receipt of long-term disability benefits under the Plan. (AR at 1174). Accordingly, on October 29, 2002, LINA informed Fourney that her claim for long-term disability benefits had been terminated, effective December 5, 2002. (<u>Id.</u>).

Fourney appealed the denial of her benefits, submitting to LINA reports by her doctors indicating that she was not yet fit for employment. (AR at 1134, 1153). For example, notwithstanding his earlier conclusion that Fourney was capable of, and would benefit from, a return to work, Dr. Cangro informed LINA that Fourney was unable to work inasmuch as she suffered from severe orthostatic hypotension, a condition that caused daily episodes of extreme dizziness. (AR at 1154). In response to Fourney's appeal, LINA submitted her records to Dr. John

4

Manfredi to conduct a peer review of the conclusions reached by Fourney's own doctors.  Dr. Manfredi agreed that Fourney was incapable of returning to work, observing that her renal failure, together with her diabetes, continued to impact her ability to work full time.  (AR at 1104).  Consistent with the doctors' recommendations, LINA reinstated Fourney's long-term disability benefits on August 25, 2003, retroactive to December 2002.  (AR at 777).

Shortly thereafter, on September 12, 2003, Fourney completed another disability questionnaire to demonstrate her continued disability.  (AR at 766).  In that questionnaire, Fourney noted that she was capable of driving, but only for short distances.  (AR at 767).  She further asserted that her daily activities included an hour of reading and two hours of television; hour-long walks; and regular exercise at a local gym. (AR at 767-68).

In November 2003, Fourney's condition worsened, and her doctors contemplated a third renal transplant.  On November 19, 2003, Fourney was referred to the University of Maryland School of Medicine, where she underwent a preoperative cardiology consultation.  (AR at 757).  It was determined that she possessed several cardiac risk factors that necessitated the repeat of

stress testing with imaging studies.  (AR at 757).  Specifically,
the cardiology consultation confirmed that Fourney suffered from
hypertension and high cholesterol, which, together with her
diabetes, could preclude any surgical procedures.  (AR at 757-
58).  Following the consultation, Fourney underwent an exercise
stress test in Charleston, during which she walked on a treadmill
for more than nine minutes before complaining of leg fatigue.
(AR at 753).  The physician administering the test concluded that
the exercise produced no unusual or obvious cardiac changes.
(Id.).

        In December 2003, Fourney also began to experience
tearing and burning in her eyes.  (AR at 755).  Her primary care
physician referred her to Dr. R. Mark Hatfield, who observed
focal scars in each of Fourney's eyes and macular ischemia in her
right eye.  (Id.).  Dr. Hatfield further noted that Fourney's
vision in her right eye had deteriorated to 20/100.  (Id.).

        On January 15, 2004, Fourney's primary care physician,
Dr. Thomas Bowden, completed a physical ability assessment of
Fourney to substantiate her disability claim.  (AR at 744-45).
According to Dr. Bowden, Fourney was capable of the following
activities during an eight-hour workday, allowing for positional
changes and meal breaks: sitting continuously for more than five

6

hours; standing and walking continuously; occasionally pushing and pulling up to twenty pounds; lifting up to fifty pounds; and occasionally climbing stairs.  (AR at 744-45).

On September 16, 2004, Fourney completed another disability questionnaire.  (AR at 736-39).  In the questionnaire, she asserted that she was capable of driving, noting that she had previously driven up to an hour at a time.  (AR at 737).  Fourney also indicated that she attempted to exercise daily by walking on the treadmill for up to an hour and lifting three-pound weights.  (AR at 737-38).  She noted that she expected to return to work when she regained her stamina and control over her glucose levels.  (AR 738).  Fourney stressed, however, that she would be unable to return to her original occupation, inasmuch as she was taking immunosuppressant drugs and thus at high risk for infection.  (Id.).

On October 4, 2004, Fourney submitted to LINA a Supplementary Claim Disability Benefits form completed in part by Dr. Cangro, her nephrologist.  (AR at 733-35).  Dr. Cangro asserted that Fourney's condition had retrogressed and, though she was considered ambulatory, she continued to suffer from chronic to severe renal failure.  (AR at 734).  Dr. Cangro further noted that Fourney had "[s]evere limitations of

7

functional capacity" and was "incapable of minimal . . .
activity." (AR at 735). Accordingly, Dr. Cangro concluded that
she should not return to work at that time. (Id.)

On November 17, 2005, Fourney was again seen by Dr.
Bowden. (AR at 543). According to Dr. Bowden's records, the
visit was a routine followup regarding Fourney's cholesterol
levels. (Id.). Dr. Bowden noted that Fourney "states she is
doing well and is without any complaints or problems at this
time." (Id.). According to Dr. Bowden, Fourney specifically
denied any abdominal or chest pain and any gastrointestinal
problems. (Id.).

On January 8, 2006, Fourney submitted another
Supplementary Claim Disability Benefits form, with Dr. Cangro
again completing a portion thereof. (AR at 665-66). Dr. Cangro
asserted that Fourney's condition had not changed since his
October 2004 assessment and that she remained ambulatory. (AR at
665). He observed that Fourney, due to her diabetes, continued
to suffer from hypoglycemia, causing severe fatigue. Dr. Cangro
also diagnosed Fourney with gastroparesis, a condition of the
stomach causing nausea and vomiting. (AR at 666). Accordingly,
Dr. Cangro again concluded that Fourney was not capable of
returning to work. (Id.).

8

In February 2006, Fourney began experiencing pain and bleeding in her right eye.  (AR at 418).  Fourney was again seen by Dr. Hatfield, her ophthalmologist, who diagnosed her with proliferative diabetic retinopathy and recurrent nonclearing vitreous hemorrhaging in her right eye.  (AR at 300).  Dr. Hatfield recommended that Fourney undergo corrective laser eye surgery.  (AR at 301).  On February 14, 2006, Fourney underwent another exercise stress test to determine whether her diabetic condition precluded surgery.  (AR at 539-40).  The physician administering the test, which consisted of Fourney walking on a treadmill for approximately eleven minutes, determined that there were no unusual or obvious changes to the heart and cleared her for surgery.  (AR at 540).  The following day, February 15, 2006, Dr. Hatfield performed surgery on Fourney's right eye.  (AR at 300).  His post-operation report indicates that Fourney recovered from the procedure without difficulty.  (Id.).

On April 30, 2006, Fourney completed a disability questionnaire, indicating that her condition remained the same. (AR at 550-53).  Fourney noted that her ability to drive was "restricted at this point [due to] diabetic retinopathy."  (AR at 549).  She asserted that she regularly attended aerobics classes, but often did not finish due to fatigue caused by her medical

condition.  (AR at 550).  Moreover, Fourney indicated that she walked up to a mile in her neighborhood as often as possible. (AR at 549).  She stressed that she would like to return to work at her regular occupation but was unable to do so inasmuch as she is immunosuppressed and thus subject to a heightened risk of infection.  (AR at 551).

In July 2006, Fourney was seen by physicians at the University of Maryland Medical System Transplant Division.  (AR at 432-35).  Fourney again reported severe nausea, vomiting, and fever, apparently due to her diabetes and diabetic gastroparesis. (AR at 432).  Following a renal transplant ultrasound, Fourney's physicians determined that she had elevated levels of creatinine and a renal cyst.  (AR at 391).  She was treated with intravenous fluids and antiemetics and advised to report to the emergency room for any fevers, chills, nausea, vomiting, or shortness of breath.  (AR at 389).

In February 2007, LINA conducted a review of Fourney's claim for long-term disability benefits, concluding that it possessed insufficient information to verify that Fourney remained totally disabled.  (AR at 390).  According to a claim strategy form dated February 21, 2007, LINA elected to pursue two strategies to secure additional information regarding Fourney's

10

condition.  (AR at 393).  First, it requested that Fourney
undergo a Functional Capacity Evaluation ("FCE"), during which a
physical therapist would evaluate Fourney's movement and function
while she performed activities normally conducted at work.  (AR
at 380).  Pursuant to LINA's request, on February 28, 2007,
Fourney scheduled a two-day FCE, to be conducted in Princeton,
West Virginia, on April 17 and 18, 2007.  (Id.).  Second, LINA
arranged for a private investigator to conduct video surveillance
of Fourney.  On March 16, 2007, LINA hired Claims Verification
Incorporated to observe Fourney and "[d]etermine [her] daily
activities and employment status."  (AR at 349).

          Between April 16 and 19, 2007, Eric Peate, an
investigator with Claims Verification Incorporated, conducted
video surveillance of Fourney.  (Id.).  According to his
surveillance notes, on April 16, Peate observed an individual he
thought to be Fourney travel as a passenger from Beckley to a
hospital in Charleston.  (AR at 352).  The following morning,
April 17, Peate observed Fourney drive approximately three miles
to a nearby tire service center.  (Id.).  Fourney also traveled
to Princeton that afternoon for her scheduled FCE.  (Id.).[1]  On

_____

          [1] The Administrative Record contains no report of Fourney's
FCE on April 17, 2007.  According to a claim strategy form dated
May 16, 2007, and completed by LINA employee Mary Vann, Fourney

April 18, Fourney drove approximately five miles to a nearby medical center and a "secured resort."  (Id.).  On April 19, Peate observed Fourney drive approximately twenty-eight miles while running various errands.  (Id.).  Peate also observed Fourney attend an aerobics class at a local gym, during which she "use[d] a step box" and "performed steps, kicks, and bends."  (AR at 362).  According to Peate's surveillance notes, Fourney participated in the class for approximately thirty-five minutes, stopping ten minutes before the class ended.  (Id.).  Finally, that same day, Peate observed Fourney walk between one and two miles with a dog at a park near her home.  (AR at 365).  Peate witnessed the dog, an adult Labrador Retriever, "yank" Fourney approximately five times.  (Id.).  Following his surveillance, Peate submitted to LINA a videotape containing one hour, thirty-eight minutes, and nineteen seconds of footage captured over the four-day period.  (AR at 1480).

        In May 2007, LINA attempted to schedule another FCE to

---

advised the physical therapist just before her April 17 FCE that she continued to suffer from diabetic retinopathy and was therefore unable to participate in the evaluation.  (AR at 342). By contrast, a vendor quality report dated September 17, 2007, and completed by LINA employee LaShusta Brown indicates that the physical therapist refused to conduct the FCE in the absence of a note from Fourney's physician clearing her for the evaluation. (AR at 73).  In any event, Fourney did not attend the second day of her FCE, scheduled for April 18, 2007.  (AR at 342).

determine Fourney's functionality.  (AR at 331).  Inasmuch as
Fourney's April FCE had been cancelled due to her medical
condition, LINA first sought clearance from her doctors.  By
letter dated May 29, 2007, LINA requested that Drs. Bowden and
Hatfield confirm whether Fourney was fit to undergo an FCE.  (AR
at 331-34).  On June 4, 2007, Dr. Bowden responded, confirming
that Fourney was "medically stable to participate in the [FCE],"
notwithstanding her kidney condition and diabetes.  (AR at 330).
Similarly, on June 20, 2007, Dr. Hatfield confirmed that
Fourney's proliferative diabetic retinopathy did not preclude her
from participating in the FCE, noting that Fourney had no
restrictions or limitations at that time.  (AR at 319).
Accordingly, on July 11, 2007, LINA scheduled a two-day FCE for
Fourney, to be conducted on August 14 and 15, 2007.  (AR at 289).

        Meanwhile, on June 11, 2007, Fourney was again seen by
physicians at the University of Maryland Medical Center
Transplant Division.  (AR at 282).  Fourney was advised that her
kidneys were functioning at only seventeen percent and that she
would need to undergo another transplant.  (AR at 285).  Fourney
was further advised that, before she could be placed on the
transplant list, she needed to undergo several tests, including a
cardiac stress test, a chest x-ray, a pelvic exam, a mammogram,

13

and a skin test.  (AR at 282).  Inasmuch as Fourney wanted to be placed on the transplant list as soon as possible, she scheduled appointments for the various tests throughout August, September, and October of 2007.  (Id.).

On July 16, 2007, just five days after LINA had scheduled a second FCE, Fourney contacted LINA and cancelled the August 14 and 15 appointments.  (AR at 257, 281).  Fourney advised LINA of the many tests she had scheduled over the ensuing months, including one scheduled for August 14, 2007, and explained that she hoped to be placed on the transplant list as soon as possible.  (AR at 169, 281).  She provided LINA with the name of the physician who had referred her to the transplant clinic at the University of Maryland (Dr. Cangro), as well as the name and contact information for the head of the transplant clinic.  (AR at 281).  After learning that Fourney was unable to attend the scheduled FCE, LINA contacted the physical therapist who was scheduled to conduct the evaluation and attempted to reschedule the appointment at a time convenient for Fourney.  (AR at 73).  On August 23, 2007, LINA scheduled an FCE for September 18 and 19, 2007.  (Id.).

On August 24, 2007, Fourney completed another disability questionnaire.  (AR at 247).  She asserted that she

14

could not work inasmuch as she was "presently on a kidney transplant list with a creatinine [level] that has [her] kidney functioning at 17%."  (Id.).  Fourney also noted that, due to her proliferative vitreous retinopathy, she was restricted from driving, lifting in excess of fifteen pounds, and bending at the waist.  (Id.).  She further stressed that she suffered from general fatigue due to her being immunosuppressed.  (Id.).  With respect to her physical activities, Fourney noted that she went on two one-mile walks per day but, due to her conditions, had been unable to participate in her daily aerobics class for the past month.  (AR at 247-48).

On August 25, 2007, Fourney was again seen by Dr. Hatfield, her ophthalmologist.  (AR at 247).  Dr. Hatfield noted that Fourney was suffering from vitreous hemorrhaging due to retinal neovascularization in her right eye.  (AR at 271).  Accordingly, Dr. Hatfield recommended that Fourney undergo a second corrective eye surgery.  (AR at 270).  In advance of the surgery, Fourney was advised to take the following precautions:

1.   Do not bend the head below the waist.

2.   Do not lift objects greater than ten to fifteen pounds.

3.   Sleep with your head elevated on two or three pillows.

15

        4.    Refrain from the use of Aspirin . . . .

        5.    No driving.

(AR at 271).


        On August 30, 2007, Fourney contacted a LINA

representative regarding the FCE scheduled for September 18 and

19, 2007.  Specifically, Fourney was concerned that, due to her

medical condition, the physical therapist would refuse to conduct

the evaluation, resulting in a wasted trip for Fourney and the

family member who had to drive her to the appointment.  (AR at

73).  In an effort "to play it safe," LINA elected to cancel the

FCE unless it could obtain clearance from Dr. Cangro, Fourney's

nephrologist.  (Id.).  On September 14, 2007, the scheduled FCE

was cancelled.  (Id.).  Twelve days later, on September 26,

Fourney underwent successful surgery on her right eye.  (AR at

255).


B.   Plan Language

        In pertinent part, the Plan provides that LINA "will

pay Disability Benefits if an Employee becomes Disabled while

covered under this Policy."  (AR at 7).  The definition of

"Disability/Disabled" is set forth in the schedule of benefits,

providing as follows:


                              16

>    The Employee is considered Disabled if, solely because
>    of Injury or Sickness, he or she is either:
>
>        1.   unable to perform all the material duties of
>             his or her Regular Occupation or a Qualified
>             Alternative; or
>
>        2.   unable to earn 80% or more of his or her
>             Indexed Covered Earnings.
>
>    After Disability Benefits have been payable for 24
>    months, the Employee is considered Disabled if, solely
>    due to Injury or Sickness, he or she is either:
>
>        1.   unable to perform all the material duties of
>             any occupation for which he or she is, or may
>             reasonably become, qualified based on
>             education, training or experience; or
>
>        2.   unable to earn 80% or more of his or her
>             Indexed Covered Earnings.

(AR at 3).

The Plan further provides that a covered employee is obligated to "provide [LINA], at his or her own expense, satisfactory proof of Disability before benefits will be paid." (AR at 7). The Plan stresses that LINA "will require continued proof of the Employee's Disability for benefits to continue." (Id.). Finally, under a section entitled "TERMINATION OF DISABILITY BENEFITS," the Plan specifies that the employee's disability benefits will end if, inter alia, "[LINA] determines he or she is not Disabled." (AR at 13).

17

C.   The Procedural History of the Claim and this Action

        In October 2007, LINA elected to terminate Fourney's long-term disability claim.  (AR at 63).  According to a claim strategy form dated October 23, 2007, and completed by LINA employee Hiram Ervin, LINA reached this decision after Fourney had failed to demonstrate her continued disability.  (AR at 64). Specifically, the claim strategy form notes that

> [Fourney] is a 42 year old former staff nurse who
> initially ceased working due to a renal transplant,
> gastroparesis and severe diabetes.  The . . . medical
> [records] submitted to date document[] EF of 66
> percent, Dr. Bowden provided script for [Fourney] to
> participate in FCE and [Fourney] did not show.  Dr.
> Hatfield states that [Fourney] is medically stable –
> Surveillance documents [Fourney] is still active.  The
> decision was made to proceed with claim closure as the
> medical [records] submitted do[] not support continued
> benefits.

(Id.).  On October 30, 2007, Fourney was informed of LINA's decision to terminate her disability benefits.  (AR at 57).  She indicated to LINA that she intended to submit additional information for review.  (AR at 57).

        On December 27, 2007, LINA received a letter, dated December 17, 2007, from Dr. Bowden, Fourney's primary care physician.  (AR at 54; 261).  The letter informed LINA of Dr. Bowden's opinion regarding Fourney's disability, providing

18

pertinently as follows:

> Mrs. Fourney continues to suffer from recurrent chronic renal failure.  She is status post renal transplants times two and is currently undergoing evaluation for repeat transplant.  She also suffers from type 1 diabetes mellitus, hyperlipidemia, and gastroesophageal reflux.

> It is my opinion that Ms. Fourney remains and will remain chronically disabled due to her chronic medical problems.  It appears there is some controversy over her current activity.  From my impression, Mrs. Fourney is able to do her activities of daily living alone, but does require assistance in any type of minimally strenuous activity.  She is very limited in her mobility with regard to strength and duration of activity.

> In regard to her physical dependency, she also has multiple physicians and appointments and routine lab work due to her chronic kidney failure and possible retransplantation of her kidneys which, in my opinion, would make it impossible for her to keep any type of employment.

(AR at 261).  Notwithstanding Dr. Bowden's letter, LINA adhered to its earlier determination that Fourney had failed to prove her continued disability.  (AR at 262).  By letter dated January 3, 2008, LINA informed Fourney that the information from Dr. Bowden "does not change the claim determination which was based on a review of the previous medical documentation and surveillance documentation."  (Id.).  LINA stressed that Dr. Bowden's letter "did not contain measurable or observable data to support [Fourney's] inability to function in any capacity."  (Id.).  Accordingly, LINA refused to reinstate Fourney's long-term

disability benefits.

On January 28, 2008, Fourney appealed LINA's decision to deny her benefits under the Plan. (AR at 259-60). With respect to the parties' failed attempts to conduct an FCE, Fourney asserted that she "should not be penalized for and cannot be held responsible for the failure to conduct the FCE, as previously scheduled attempts to do so have failed to be completed because of circumstances beyond [her] control." (AR at 259). Fourney further stressed that she "remain[ed] willing to undergo the FCE" and requested that LINA reschedule the FCE at the earliest possible date, before resolving her appeal. (Id.).

By letter dated January 31, 2008, LINA responded to Fourney's request for an appeal, asserting that it would "consider any additional relevant information which supports [her] disability." (AR at 258). LINA directed Fourney to provide any such information no later than February 21, 2008. Despite Fourney's request that LINA schedule an FCE before resolving the appeal, the letter did not mention an FCE or any other evaluation of her disability. (Id.).

On February 13, 2008, LINA received a letter from Dr. Greta Guyer, Fourney's endocrinologist. In pertinent part, Dr.

Guyer's letter provided as follows:

> [Fourney] is status post a renal transplant in
> 2001.  She has had a history of type I diabetes since
> college and currently her creatinine level is 3.6 and
> her GFR equals 15.  Her most recent hemoglobin A1c
> value is 9.3%.  She takes Lantus Insulin 13 units in
> the morning and Novolog Insulin she takes 1 unit for
> every 15 grams of carbohydrate as well as 1 unit for
> every 70 mg/dl that her blood sugar is greater than
> 110.  She has to set an alarm at 3:00 a.m. every night
> to check her blood sugars for hypoglycemia.  She has a
> history of hypoglycemia unawareness and will get blood
> sugars two times a week that require assistance that
> are in the hypoglycemia range.  She also has peripheral
> neuropathy which makes it difficult for her as far as
> standing or sitting for long periods of time and
> difficulty as far as proprioception with walking.
>
> I feel that this patient is permanently disabled
> secondary to her diabetes and the severe hypoglycemic
> episodes that she gets which can occur without notice.
> At least two times a week she has episodes of
> hypoglycemia that require assistance.  She needs to
> check her blood sugars frequently throughout the day
> and as well as eat meals frequently to avoid
> hypoglycemia.  I think that these restrictions would
> preclude her from any type of employment.  She also has
> peripheral neuropathy and hypertension.  She also has a
> pituitary adenoma which I am following as well as she
> is status post a renal transplant and has chronic
> kidney disease after that.

(AR at 251).

By letter dated May 7, 2008, LINA upheld the denial of

Fourney's claim.  (AR at 221-23).  LINA acknowledged the

recommendations of Drs. Bowden and Guyer that Fourney not return

to work, but asserted that its own medical director, Dr. John

Mendez, had reached the opposite conclusion.  (AR at 221-22).

Specifically, Dr. Mendez found the following:

> Based on the provided records, including
> surveillance, it is medically probable that Ms. Fourney
> is capable of at least sedentary to light physical
> demand level work duties full time.  This is because .
> . . she appears very functional on surveillance
> conducted over 4 days . . . .  She states in her
> 8/24/07 [disability questionnaire] that she is unable
> to drive.  Dr. Bowden's 12/17/07 letter indicates she
> is very limited in mobility regarding strength and
> activity duration and Dr. Guyer's 2/13/08 letter
> describes peripheral neuropathy with difficulty
> standing or sitting for long periods and walking and
> severe hypoglycemic episodes occurring without notice
> at least twice per week.  In contrast, the surveillance
> video shows her driving for extended periods on
> separate days and walking up to 1 mile[] with her dog.
> . . . She also underwent exercising testing for surgery
> clearance on 7/5/07. . . .  She exercised 11 minutes,
> [which] is compatible with medium work capacity.  So,
> because of the multiple reasons above, Ms. Fourney's
> and her physician's reported work capacities are
> significantly less than those demonstrated by
> surveillance video and exercise testing.

(AR at 44).  Based on Dr. Mendez's evaluation, LINA identified

several occupations suitable for Fourney, including the

following: nurse consultant, utilization coordinator, school

nurse, office nurse, and inservice coordinator.  (AR at 222).

Inasmuch as it no longer considered Fourney unable to perform all

the material duties of any occupation for which she was

qualified, LINA concluded that Fourney was no longer disabled, as

defined by the Plan.  (Id.).

        In January 2009, Fourney initiated this action in the

Circuit Court of Kanawha County.  (Notice of Removal 2).  On
February 25, 2009, LINA removed.  (<u>Id.</u> at 1).  In her complaint,
Fourney alleges that she is disabled as defined by the Plan and
that LINA "arbitrarily and capriciously cut off [her] entitlement
to disability benefits."  (Compl. ¶ 5).

                                II.

A.   Standard of Review

        The standard of review for a decision made by an
administrator of an ERISA benefit plan generally is <u>de</u> <u>novo</u>.
<u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989);
<u>Bynum v. Cigna Healthcare of North Carolina, Inc.</u>, 287 F.3d 305,
311 (4th Cir. 2002); <u>Richards v. UMWA Health & Retirement Fund</u>,
895 F.2d 133, 135 (4th Cir. 1989); <u>de Nobel v. Vitro Corp.</u>, 885
F.2d 1180, 1186 (4th Cir. 1989).  Where the plan gives the
administrator discretion to determine benefit eligibility or to
construe plan terms, however, the standard of review is whether
the administrator abused its discretion.  <u>Firestone</u>, 489 U.S. at
111; <u>Stup v. Unum Life Ins. Co. of Am.</u>, 390 F.3d 301, 307
(4th Cir. 2004); <u>Bynum</u>, 287 F.3d at 311.

        Our court of appeals has held that an ERISA plan can
confer discretion on its administrator in two ways: "(1) by

                                23

language which 'expressly creates discretionary authority,' and
(2) by terms which 'create discretion by implication.'" Woods v.
Prudential Ins. Co. of Am., 528 F.3d 320, 322 (4th Cir. 2008)
(quoting Feder v. Paul Revere Life Ins. Co., 228 F.3d 518, 522-23
(4th Cir. 2000)).  Whether discretion is created expressly or
implicitly, however, "the plan must manifest a clear intent to
confer such discretion" for the abuse of discretion standard to
apply.  Id.; see also Gallagher v. Reliance Std. Life Ins. Co.,
305 F.3d 264, 270 n.6 ("If a plan does not clearly grant
discretion, the standard of review is de novo.").  Finally, in
determining whether a plan sufficiently confers discretion, the
reviewing court must construe any ambiguity in the plan against
its drafter and in accordance with the insured's reasonable
expectations.  Woods, 528 F.3d at 322.

B.   The Standard Applicable to LINA

         With these principles in mind, the court must determine
whether the Plan confers discretionary authority on LINA over
benefit determinations.  Although the parties appear to agree
that the Plan does not do so expressly, LINA contends that such
authority should be implied inasmuch as the Plan specifies that a
claimant is eligible for benefits when "[LINA] determines he or
she is . . . Disabled."  (AR at 13).  LINA further emphasizes the

24

Plan's requirement that a claimant, to maintain eligibility, must submit to it "proof of earnings and continued Disability."  (AR at 3).  LINA maintains that the Plan language makes clear that it "is the sole decision-maker with regard to the provision of [long-term disability] benefits to plan participants," thereby warranting application of the deferential standard of review. (Def.'s Resp. at 2).

The Fourth Circuit recently addressed and rejected a similar argument.  See Woods v. Prudential Ins. Co. of Am., 528 F.3d 320, 322-24 (4th Cir. 2008).  In Woods, the administrator of an ERISA benefits plan asserted that the abuse of discretion standard should govern its benefits determination, inasmuch as the plan at issue specified that a claimant was eligible for benefits only if the administrator determined that eligibility exists.  Id. at 322.  The Fourth Circuit found this contention unpersuasive, noting that "discretionary authority is not conferred by the mere fact that a plan requires a determination of eligibility or entitlement by the administrator."  Id. (internal quotation marks omitted).  Indeed, inasmuch as "almost all ERISA plans designate an administrator who . . . must determine whether a participant is eligible for benefits," the court observed that acceptance of the administrator's contention

25

would result in application of the deferential standard of review
in nearly every ERISA benefits case.  Id. at 323-24.
Accordingly, the court concluded that, where the benefits plan
merely assigns authority with the administrator to make benefit
designations, de novo review is appropriate.  Id. at 324.

Like the benefits plan in Woods, the Plan at issue here
confers mere authority, as opposed to discretion, on LINA.  To be
sure, the Plan vests with LINA the authority to determine whether
a claimant is disabled and therefore eligible for benefits.  For
instance, the Plan alerts the claimant that he must submit to
LINA proof of earnings and continued disability to be eligible
for benefits and that benefits will be terminated when "[LINA]
determines he . . . is not Disabled."  (AR at 3, 13).  Nothing in
these phrases, however, alerts the claimant that LINA "will enjoy
wide discretion in wielding its authority as well as freedom from
searching judicial scrutiny," as is required to trigger the abuse
of discretion standard.  Woods, 528 F.3d at 323; cf. United
McGill Corp. v. Stinnett, 154 F.3d 168, 171 (4th Cir. 1998)
(finding discretionary authority where benefits plan granted
administrator authority to "construe the terms of the Plan and
resolve any disputes which may arise with regard to the rights of
any persons under the terms of the plan").  Fourth Circuit

precedent therefore compels application of de novo review in this matter.

### III.

Under the Plan, an insured employee is generally entitled to disability benefits if he or she is "unable to perform all the material duties of his or her Regular Occupation or a Qualified Alternative."  (AR at 3).  When disability benefits have been payable for twenty-four months, however, a different standard applies.  Under this so-called "any occupation" standard, which the parties agree governs this dispute, the insured employee is entitled to continued receipt of disability benefits if he or she is either (1) "unable to perform all the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience;" or (2) "unable to earn 80% or more of his or her Indexed Covered Earnings."  (AR at 3).  Accordingly, to qualify for disability benefits, Fourney must submit satisfactory proof that she was unable to perform all the material duties of any occupation for which she is, or may reasonably become, qualified based on education, training or experience.  See Gallagher v. Reliance Standard Life Ins. Co., 305 F.3d 264, 270 (4th Cir. 2002) (noting that burden of proving disability falls on

employee).

A.   Evidence Supporting Fourney's Disability

        Fourney submitted substantial evidence demonstrating
her inability to perform the material duties of any occupation
for which she is or may become qualified.  Most important are the
opinions of her treating physicians, all of whom concluded that
Fourney's end-stage renal failure precludes her from working.
Dr. Bowden, for example, reviewed Fourney's extensive medical
problems in December 2007 and concluded that "[s]he is very
limited in her mobility with regard to strength and duration of
activity."  (AR at 261).  Dr. Bowden also observed that Fourney,
due to her serious medical condition, "has multiple physicians
and appointments" and must regularly undergo "routine lab work,"
making it "impossible for her to keep any type of employment."
(Id.).  Dr. Guyer raised similar concerns in her February 2008
letter, noting that Fourney's peripheral neuropathy "makes it
difficult for her as far as standing or sitting for long periods
of time" and that Fourney has "severe hypoglycemic episodes"
twice per week.  (AR at 251).  Citing a host of objective
evidence supporting Fourney's medical condition, Dr. Guyer
concluded that Fourney's medical condition "would preclude her
from any type of employment."  (Id.).  Finally, Fourney's

28

disability was supported by the opinion of Dr. Cangro, her
nephrologist.  In January 2006, Dr. Cangro observed that Fourney
"has many of the complications of long-standing type one
diabetes," including "hypoglycemia unawareness, unpredictable
ability to take in food secondary to nausea, vomiting and
gastroparesis, as well as two . . . deconditioning and failing
renal transplants."  (AR at 666).  Based on these severe
conditions, Dr. Cangro recommended that Fourney "be categorized
as fully disabled for an indefinite time." (Id.).

        The medical evidence submitted by Fourney in support of
her disability is noteworthy in a number of respects.  First,
Fourney's medical record demonstrates that every single physician
who examined her in person during the relevant time frame has
concluded that she is disabled and thus incapable of working.
(AR at 251, 261, 666, 735, 1104, 1134, 1154).  The consistency in
her physicians' recommendations is certainly compelling evidence
that Fourney was, and indeed remains, fully disabled.  Second,
each of Fourney's physicians rested their recommendations not
only on her physical limitations, but also on the substantial
impact Fourney's medical condition has on her day-to-day life.
The physicians observed, for example, that Fourney was incapable
of long periods of certain physical activities, including

standing and walking.  (AR at 251, 666).  They also highlighted, however, the substantial number of appointments and tests Fourney must undergo to manage her complicated medical conditions.  (AR at 251, 261).  Such constant interruptions in Fourney's daily life, the physicians concluded, would make employment "impossible."  (AR at 261).  Third, with respect to physical limitations, it is worth noting that Fourney's physicians focused on her inability to perform certain physical activities for long periods of time.  For example, Dr. Guyer observed that Fourney, due to her medical condition, would have difficulty "standing or sitting for long periods of time." (AR at 251).

B.   Evidence Supporting LINA's Benefits Decision

        The administrative record demonstrates that LINA relied on two items in electing to terminate Fourney's disability benefits.  First, LINA concedes that its decision was predicated in large part on the surveillance video, which depicted Fourney engaging in various activities that, according to LINA, contradict her asserted limitations.  (Def.'s Resp. at 3).  Second, LINA emphasized the evaluation of its medical director, Dr. Mendez, who reviewed the documents submitted with Fourney's administrative appeal and supported LINA's original decision to terminate benefits.  The court reviews each of these items in

turn.

1.    Video Surveillance

        LINA contends that the video surveillance provides
substantial evidence for its decision to deny Fourney's claim for
benefits, inasmuch as the video depicts Fourney engaging in
activities that, according to LINA, are beyond her stated
limitations.   Specifically, LINA emphasizes that Fourney
participated in an aerobics class, walked with a Labrador that
pulled on the leash a few times, and drove in excess of thirty
miles during the four-day span in which surveillance was
conducted.   LINA maintains that these activities demonstrate that
Fourney was at least capable of sedentary work, supporting its
decision to terminate her claim for disability benefits.

        There are, of course, situations in which video
surveillance is useful in determining the veracity of a
claimant's subjective complaints.   Indeed, courts routinely
consult such evidence in reviewing the reasonableness of an
administrator's denial of benefits.   See, e.g., Cusson v. Liberty
Life Assur. Co., 592 F.3d 215, 229-30 (1st Cir. 2010) (concluding
that video surveillance supported administrator's decision to
terminate benefits); Mote v. Aetna Life Ins. Co., 502 F.3d 601,

609 (7th Cir. 2007) ("In short, the videotapes show [the claimant] engaging in many of the activities that she claimed to be unable to accomplish in her application for long-term disability benefits and, consequently, the Plan properly considered them.").

Surveillance evidence, however, is generally limited in temporal scope in comparison with a regular work week. As a result, these cases make clear that, although an administrator may consider surveillance evidence in reviewing a claim for benefits, the administrator should place significant weight on such evidence only when it stands in stark contrast to the subjective evidence submitted by the claimant. See Coffman v. Metro. Life Ins. Co., 217 F. Supp. 2d 715, 733 n.5 (S.D. W. Va. 2002). This point is further illustrated by cases from the First and Eighth Circuits. In Cusson, the First Circuit determined that video surveillance provided substantial evidence for the plan administrator's decision to terminate the claimant's disability benefits, even though the video depicted the claimant outside of her home for only a short amount of time. 592 F.3d at 228-29. The court noted that the evidence was pertinent inasmuch as it "shows [the claimant] doing particular activities that she claimed she could not do." Id. at 229. By contrast, in Morgan

v. Unum Life Insurance Co. of America, the Eighth Circuit
concluded that video surveillance, which depicted the claimant
"driving his car, . . . carrying light objects, . . . and
stretching and doing light aerobic exercise at the gym for about
forty-five minutes," failed to support the plan administrator's
decision to terminate benefits.  346 F.3d 1173, 1178 (8th Cir.
2003).  The Eighth Circuit deemed the surveillance evidence
unremarkable inasmuch as the claimant had already alerted the
administrator that his typical day included the very activities
in which he was seen engaging.  Id. at 1178.  Accordingly, the
court concluded that the video "revealed nothing new and was not
substantial evidence supporting" the administrator's decision.
Id.

        The video surveillance in this case is remarkably
similar to that at issue in Morgan and simply does not support
LINA's decision to rescind Fourney's disability benefits.  As an
initial matter, the evidence is entirely consistent with
Fourney's medical record.  The surveillance demonstrates that,
over a four-day period in April 2007, Fourney walked between one
and two miles with a dog; engaged in light aerobic exercise,
consisting of repeated step-ups onto a block some six inches off
the ground; and drove her car approximately thirty miles while

33

running various errands.  (AR at 349-65, 1480).  Notably,
however, none of Fourney's treating physicians asserted that such
activities were beyond her physical capabilities.  Dr. Bowden,
for example, observed that Fourney was capable of engaging in
such "minimally strenuous" activities, though only for a limited
duration.  (AR at 261).  That Fourney walked less than two miles
and partially completed an aerobics class is entirely consistent
with her physicians' recommendations.

        Moreover, and perhaps more damaging to LINA's
contention that the video evidence substantially supports its
decision, Fourney had previously alerted LINA that she regularly
engaged in the very activities depicted in the surveillance
video.  Notwithstanding these admissions, Fourney continued to
receive disability benefits for nearly seven years.  With respect
to the physical activities observed, Fourney indicated to LINA as
early as October 2000 that she regularly exercised by, among
other things, engaging in activities similar to those depicted in
the video surveillance.  (AR at 550, 738, 1429).  Indeed, in her
April 2006 questionnaire, completed nearly one year before the
surveillance was conducted, Fourney informed LINA that she was a
regular participant in the very aerobics class that is at the
heart of LINA's benefits decision.  (AR at 550).  Consistent with

34

what the private investigator observed, Fourney indicated in her
April 2006 questionnaire that she participated in the aerobics
class but often had to quit early due to fatigue.  (Id.).  Thus,
that Fourney engaged in such activities while under surveillance
is entirely unremarkable, considering LINA's decision to pay her
disability benefits for seven years despite its knowledge that
she engaged in such activities.[2]

        Fourney had also indicated to LINA well before the
April 2007 surveillance that she was capable of driving and, in
fact, often drove to her various medical appointments and other
activities.  Between June 2002 and September 2004, Fourney
submitted three disability questionnaires, each of which
indicated that she regularly drove, sometimes up to one hundred
miles at a time.  (AR at 737, 767, 1303).  To be certain, Fourney
advised LINA in April 2006 and August 2007 that her driving had
been restricted at those times.  (AR at 247, 549).  Her medical
records, however, explain the source of the restrictions: Fourney

---

[2] Similarly unremarkable is the fact that Fourney, while
under surveillance, walked between one and two miles with a
Labrador appearing to weigh in excess of seventy-five pounds.
The video depicts Fourney walking with the dog for only about ten
minutes, and the dog is not leashed for much of that time.   (AR
at 1480).  Moreover, that the dog "yanked" Fourney several times
during the short period it was leashed is of little consequence.

underwent corrective eye surgery in February 2006 and September 2007, meaning that she was either recovering from or preparing for surgery when she completed the April 2006 and August 2007 questionnaires.  (AR at 255, 539-40).  That Fourney was unable to drive at these times yet was capable of driving in April 2007, over one year after her first eye surgery and several months before her second, is neither inconsistent with her medical records nor indicative of her ability to perform sedentary work despite her medical conditions.

In short, the video evidence merely confirms what Fourney's physicians had concluded all along: that she was capable of engaging in minimally strenuous activity, albeit for short periods of time only.  Even if the surveillance demonstrated that Fourney had engaged in physical activities beyond her physicians' recommendations, the evidence is yet insufficient to support LINA's decision; LINA was well aware that Fourney regularly engaged in these activities yet continued to pay her disability benefits for approximately seven years. Accordingly, the surveillance evidence "revealed nothing new" about Fourney's ability to work and does not provide substantial support for LINA's decision.  See Morgan, 346 F.3d at 1178.

36

2.  Dr. Mendez's Evaluation

        LINA also relied heavily on the evaluation of its own
medical director, Dr. Mendez.  (AR at 44).  Following Fourney's
administrative appeal of the termination of her disability
benefits, LINA submitted Fourney's medical records, including the
video surveillance, to Dr. Mendez and requested that he review
its decision.  Based on his review, Dr. Mendez concluded that
Fourney was capable of at least sedentary work.  (Id.).  He
acknowledged that she suffered from Type 1 diabetes,
proliferative diabetic retinopathy in her right eye, chronic
renal failure, "and other multiple medical problems," but noted
simply that "she appears very functional on surveillance
conducted over 4 days."  (Id.).  By way of example, Dr. Mendez
highlighted Fourney's driving while under surveillance, as well
as an exercise stress test in July 2007 during which she walked
for approximately eleven minutes.  (Id.).  Dr. Mendez concluded
that such activities were "compatible with a medium work
capacity" and thus agreed with LINA's decision to terminate her
disability claim.  (Id.).

        Dr. Mendez's opinion that Fourney was capable of
sedentary work provides only minimal support for LINA's benefits

37

decision.  To begin with, Dr. Mendez's opinion was directly
contrary to the opinions of Fourney's treating physicians, all of
whom concluded after examining Fourney that she was incapable of
holding regular employment.  (AR at 251, 261, 666, 735, 1104,
1134, 1154).  Although "courts have no warrant to require
administrators automatically to accord special weight to the
opinions of a claimant's physician," <u>Black & Decker Disability
Plan v. Nord</u>, 538 U.S. 822, 834 (2003), LINA can offer no reason
why Dr. Mendez's opinion, which resulted from a mere
administrative review, should be valued over the unanimous
conclusions of Fourney's own physicians.

     Furthermore, unlike Fourney's treating physicians, who
cited lab results and other objective evidence to support their
recommendations, Dr. Mendez relied exclusively on the
surveillance evidence that, as discussed, was not indicative of
her ability to work.[3]  Indeed, Dr. Mendez ignored the severity of
Fourney's medical condition, including the fact that her kidneys
were apparently functioning at less than twenty percent and that

_____

[3] Dr. Mendez cited an exercise test conducted on July 5,
2007, as further support for his conclusion that Fourney was
capable of sedentary work.  Fourney did not undergo such a test
in July 2007; rather, she underwent exercise stress tests in
November 2003 and February 2006, the results of which were
disclosed to LINA as early as June 26, 2006.  (AR at 538-39,
757).

she may well need to undergo a third kidney transplant. Dr.
Mendez also failed to acknowledge the significant impact
Fourney's continuing treatment would have on her ability to
maintain employment. In light of the overwhelming evidence to
the contrary, the court finds that Dr. Mendez's evaluation does
little to support LINA's benefits decision. <u>See</u> <u>Love v. Nat'l</u>
<u>City Corp. Welfare Benefits Plan</u>, 574 F.3d 392, 396-97 (7th Cir.
2009) (overturning administrator's decision to deny benefits for
failing to explain "why it chose to discount the near-unanimous
opinions of [the claimant's] treating physicians); <u>Kalish v.</u>
<u>Liberty Mut./Liberty Life Assurance Co.</u>, 419 F.3d 501, 510 (6th
Cir. 2005) (reversing denial of disability benefits when
administrator's medical consultant failed to rebut contrary
medical conclusions of claimant's primary physician); <u>Morgan</u>, 346
F.3d at 1178 (concluding that opinion of administrator's in-house
physician "was directly contrary to the opinions of [the
claimant's] two primary treating physicians" and did not provide
support for decision to rescind benefits).

C.   Conclusion

        In summary, Fourney submitted overwhelming medical
evidence demonstrating her inability to perform the material
duties of any occupation for which she is or may become

39

qualified.  No less than three physicians, all of whom saw Fourney in person numerous times during the relevant time period, concluded that she was incapable of working.  By contrast, LINA can point only to video surveillance and the opinion of its own medical director to support its decision to terminate Fourney's disability benefits.  For the reasons outlined above, however, this evidence provides little support, inasmuch as it was entirely consistent with Fourney's medical records and her own admissions to LINA regarding her physical activities.  Accordingly, following de novo review, the weight of the evidence demonstrates that Fourney was entitled to continued receipt of her disability benefits and that LINA thus erred in terminating her disability claim.

IV.

        Based on the foregoing discussion, it is ORDERED as follows:

    1.    That plaintiff's motion for summary judgment be, and it hereby is, granted;

    2.    That defendant's motion for summary judgment be, and it hereby is, denied;

    3.    That judgment be entered in favor of plaintiff as to her claim for disability benefits; and

4.      That the parties are directed to submit, on or before
        November 30, 2010, a proposed judgment order for entry
        in keeping with this memorandum opinion and order.

        The Clerk is directed to forward copies of this written
opinion and order to all counsel of record and any unrepresented
parties.

                        DATED: November 15, 2010

                        _____
                        John T. Copenhaver, Jr.
                        United States District Judge